UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X

KENNETH KAMMERER, and
THOMAS HALLIGAN On Their Own
Behalf and On Behalf Of All Similarly
Situated,

                      Plaintiffs,

           - against -

THE MOTION PICTURE INDUSTRY
PENSION PLAN and BOARD OF
DIRECTORS OF THE MOTION
PICTURE INDUSTRY PENSION
PLAN, As Plan Administrator,

                      Defendants.

------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 3224 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

       Kenneth Kammerer and Thomas Halligan, on behalf of themselves and a class of similarly situated individuals, filed consolidated actions alleging that the pension plan of Local 52 (the "Plan" or "Local 52 Plan"), International Alliance of Theatrical Stage Employees ("I.A.T.S.E."), violates the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Plaintiffs allege that the Plan violated ERISA's minimum accrual standards by awarding Plaintiffs

and similarly situated participants less than a ratable share of a full year of pension credit for years in which the participants worked less than full time.[1]

In December, 2010, the parties filed cross-motions for summary judgment. For the reasons set forth below, summary judgment is denied to Plaintiffs but granted to Defendants.

## II.   BACKGROUND[2]

Founded in 1924, Local 52 is a union of motion picture studio mechanics, with current membership of approximately 3,200.[3] Plaintiffs Kammerer and Halligan were both members of Local 52 and participants in the Local 52 Plan. On January 1, 2004, the Local 52 Plan merged with the Motion Picture Industry Pension Plan ("MPIPP"), which now administers and pays

---

[1]   Plaintiffs allege two counts for relief that are substantively identical and which will therefore be analyzed together. The first count contends that the Plan provides for less than a ratable share for participants that retired prior to 2004. The second count similarly contends that the Plan's amended formula, which took effect on January 1, 2004 and applies to participants who retire on or after that date, provides for less than a ratable share. *See* Amended Complaint ("Am. Compl.") ¶¶ 36-42.

[2]   Both parties have agreed to most of the material facts. *See* Joint Stipulations ("Joint Stips."). Unless otherwise noted, the facts contained in this section are taken from the Joint Stipulations.

[3]   *See* History of Local 52, http://www.iatselocal52.org/public/history/history.html.

benefits accrued under either or both plans.  Kammerer, retired since January 1,

2003, receives his pension from the MPIPP.  Halligan is still in the workforce and

actively participates in the MPIPP, from which he expects to receive a pension,

based, in part, on his service under the Local 52 Plan.[4]

Plaintiffs are seeking, *inter alia*, reformation of the Plan retroactive to

January 1, 1976, recalculation of the benefits they earned under the Plan, and, in

the case of Kammerer, a retroactive and prospective increase in his pension.

## A.    The Local 52 Plan

The Local 52 Plan, a multi-employer pension plan,[5] pays a pension

amount equal to the number of pension credits earned by participants after

February 18, 1957, multiplied by the monthly benefit accrual rate in effect at the

time of retirement.[6]  An exception is made for participants with a two-year

interruption in continuous service.[7]  For those participants, the pension benefit was

---

[4]      Am. Compl. ¶ 1.

[5]      "The term 'multiemployer plan' means a plan— (i) to which more
than one employer is required to contribute, (ii) which is maintained pursuant to
one or more collective bargaining agreements between one or more employee
organizations and more than one employer, and (iii) which satisfies such other
requirements as the Secretary may prescribe by regulation."  29 U.S.C. §
1002(37)(A).

[6]      *See* Am. Compl. ¶ 12.

[7]      *See id.*

prorated based on the pension credits accumulated prior to each such interruption and the benefit level then in effect.[8]

### i.   Partial Credits

Participants in the Local 52 Plan who earned fewer than 120 days in a year were credited with fractions of pension credits.  Article 4 of the Plan addresses the method by which pension credits are accrued and when the pension vests.  Section 4.01(a) of the 1979 Plan states that:

> During the Contribution Period, a Participant shall be credited with Pension Credits on the basis of his days of service in Covered Employment during a calendar year in which contributions to the Pension Fund were made in accordance with the following schedule:

| Days Paid for in Covered Employment in Calendar Year | Pension Credit Earned For Year |
| --- | --- |
| 0 - 29 | 0 |
| 30 - 59 | 1/4 |
| 60 - 89 | 1/2 |
| 90 - 119 | 3/4 |
| 120 - over | 1 |

> If in a Plan Credit Year, a Participant completes a Year of Vesting Service but less than 30 days of Service in Covered Employment, he shall be credited with a prorated portion of a full Pension Credit in that ratio of his days of

---

[8]      *See id.*

4

Service in Covered Employment to 200.

Therefore, a Local 52 Plan participant would receive a full pension credit for the year when he worked 120 days, a 75% credit when he worked 90-119 days, a 50% credit when he worked 60-89 days in a year, and so on.  This breakdown has remained the same throughout the subsequent Plan revisions over the years.

### ii.   "Year of Participation"

Section 1.14 of the 1979 Plan states that, "[f]or purposes of compliance with Regulation 2530 of the Department of Labor, a 'Year of Participation' means a Plan Credit Year in which a Participant has completed 200 days of work in Covered Employment during a Contribution Period."  The 1988 Plan also contains this two hundred day definition at Section 1.15, as does the 1993 Plan at Section 1.17.  However, on June 22, 1995, the Board of Trustees of the Local 52 Plan voted to adopt a proposed restated plan ("Restated Plan"), retroactively effective to January 1, 1989.  The Restated Plan did not contain a definition of "Year of Participation."  Thus, in effect, there was no definition of "Year of Participation" from January 1, 1989 to January 1, 2004, when the Local 52 Plan merged into the MPIPP.  It is unclear whether this omission was

intentional or inadvertent.[9]

### B.    Kammerer's Pension

Kammerer began accumulating pension credits under the auspices of the Plan in 1966, when he earned a quarter of a year's worth of credit. He worked consistently, earning at least a portion of a credit for every year until 1991 (with the sole exception of 1975). Though Kammerer did not work in 1991, his pension nevertheless vested at that time. From 1991 to 1994, Kammerer did not work due to a poor job market.[10] He resumed employment in 1995, worked through 2001, and retired effective January 1, 2003.

On April 26, 1993, a "Pension Evaluation Estimate" was produced for Kammerer, indicating that up to December 31, 1992 he had accrued a pension based on twenty-one pension credits at an accrual rate of $36.00 per credit ($756.00 per month). On November 1, 1993, Kammerer was advised that he had

---

[9]     Defendants argue that the deletion of the "Year of Participation" definition was, alternately, a "single act of inadvertence," a "clerical error," an "administrative error," a "scrivener's error," and an "inadvertent omission." Plaintiffs counter that the definition was removed only after extensive review by Plan attorneys, and was never re-inserted in any of the following iterations of the Plan. Regardless, reaching a conclusion as to the purpose of the deletion would require me to weigh evidence, which I cannot do in deciding motions for summary judgment.

[10]     *See* Affidavit of Plaintiff Kenneth Kammerer ("Kammerer Aff.") ¶ 2.

not had substantial employment covered by the Plan for the "two year period that ended December 31, 1992."[11] The stated purpose of the letter was to advise Kammerer of his entitlement to a pension even if he did not return to employment, at an estimated monthly amount of $756 per month, payable at age sixty-five. Kammerer returned to covered employment in 1995, and began accumulating more pension credits. On June 22, 1998, another Pension Evaluation Estimate was prepared for Kammerer, stating that Kammerer had accumulated 24.25 pension credits, at $66.00 per credit through April 1998, entitling him to a pension of $1,601.00 per month effective October 1, 2002. The next Pension Evaluation Estimate, dated November 6, 2001, advised Kammerer that he had earned a pension of $1,249.00 per month effective January 1, 2002, based on twenty-one pension credits earned from 1966 to 1990, and 6.75 pension credits earned from 1995 to 2001.

When Kammerer received the November estimate, he met with the Local 52 business agent to discuss why his pension estimate had decreased, and was informed that he had two breaks in service that would greatly reduce his pension. On March 6, 2002, counsel to the Local 52 Plan advised Kammerer that the Trustees had denied Kammerer's informal request to modify the rules

---

[11]     11/1/93 Board of Trustees Letter to Kammerer, Ex. 24 to Joint Stips.

governing the calculation of benefits when a participant has one or more two-year breaks in service.[12]

Kammerer submitted an application for pension benefits on December 22, 2002, electing the 100% Joint & Survivor option. On February 10, 2003, the Local 52 Plan informed Kammerer that he had been found eligible for the pension benefit for which he had applied.[13] The Plan forwarded a check for $2,016.00, representing two pension payments of $1,008.00 each. That amount constituted an actuarial reduction from $1,295.00 per month due to the 100% Joint & Survivor option that Kammerer chose.

### C.    Alleged Under-Crediting

Plaintiffs assert that they received less pension benefits than they were entitled to because a full year of credit, rather than a 75% credit, would be due to participants for years in which they worked at least 113 days.[14] There is one year that fits this description for Kammerer. In 1980, Kammerer worked a total of 118 days and was awarded a 75% credit. Halligan has participated in the

---

[12]    *See* 3/6/02 Letter from April D. Harris, Counsel to Local 52 Plan, to Kammerer, Ex. 29 to Joint Stips.

[13]    *See* 2/10/03 Letter from Raymond O. Wagner, Local 52 Pension Fund Employee, to Kammerer, Ex. 34 to Joint Stips.

[14]    *See* Am. Compl. ¶¶ 32, 34.

Local 52 Plan since 1979, and received a 75% pension credit in 1989 and 1999 after working 116 and 115 days, respectively.

### D.      Customary Work Year

Plaintiffs contend that a two hundred day work year is unenforceable because it exceeds the customary work year for motion picture studio mechanics. Local 52 employees are mostly freelancers that work for multiple employers over the course of a year.[15]  As a consequence of the freelance nature of their profession, Local 52 members often work job-to-job, resulting in significant interruptions in their employment during the year.  Over the years of Kammerer's employment, the movie industry in New York City was affected by various financial, weather, and other factors that encouraged film production in other locales, particularly the West Coast and Canada.[16]  Of course, the fact that Local 52 members were the highest paid studio mechanics in the United States during the relevant time period detrimentally affected the availability of union work as well.[17]  As a result, the percentage of active Local 52 participants who worked 200

---

[15]      *See* Kammerer Aff. ¶ 32.

[16]      *See id.* ¶¶ 34-37.  For an excellent collection of movies and television shows filmed in California and Canada but set in other locations, *see* http://tvtropes.org/pmwiki/pmwiki.php/Main/CaliforniaDoubling.

[17]      *See* Kammerer Aff. ¶ 38.

9

or more days in a given year ranged from a low of 23% to a high of 44% from 1989-2003, with an average of 31.3%.[18]

## III.   APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[19] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[20]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[21] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact

---

[18]    *See* Local 52 Two Hundred Day Chart, Ex. 3 to Affidavit of Pension Benefits Manager Wil Ubillus in Opposition to Plaintiffs' Motion for Summary Judgment ("Ubillus Aff.").

[19]    Fed. R. Civ. P. 56(c).

[20]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[21]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

on an essential element of the non[-]movant's claim."[22]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[23] The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[24] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[25] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[26]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[27] However, "'only

---

[22]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[23]     *See id.*

[24]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[25]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[26]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[27]     *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

11

admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"[28] "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[29] Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

### B.    Accrual of Benefits

"The central purpose of ERISA is to protect beneficiaries of employee benefit plans."[30] Employees that work at least one thousand hours a year must receive at least a "ratable portion of the accrued benefit to which [they] would be entitled" if they were employed full time.[31] "A plan may provide an employee with credit for the exact percentage of a full year based on the hours the employee

---

[28]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[29]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[30]    *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009).

[31]    29 U.S.C. § 1054(b)(4)(B).

12

worked during the year."[32]  As a less time-intensive alternative, employers can

create a range of hours wherein any employee who falls within the same range of

hours receives the same percentage of credit.[33]  As long as all the employees

within a range earn at least a ratable portion of the full time benefit, the plan

complies with ERISA.[34]  This means that, if a full year is defined as two thousand

hours, the plan can give credit for sixty percent of a year to employees who work

between 1,001 and 1,200 hours in a year.[35]  Because 1,200 is sixty percent of a full

year, all employees in the range will earn no less than a ratable portion.

Importantly, ERISA permits a plan to award a full year of credit for less than a full

year of participation.[36]  While plans are permitted to determine the number of

---

[32]     *Campanella v. Mason Tenders' District Council Pension Plan*, 299 F. Supp. 2d 274, 282 (S.D.N.Y. 2004).

[33]     *See* 29 C.F.R. § 2530.204(c)(4)(ii).

[34]     *See id.*

[35]     *See Campanella*, 299 F. Supp. 2d at 282.

[36]     *See* 29 C.F.R. § 2530.204-2(c)(2) ("For purposes of calculating the portion of a full year of participation to be credited to an employee whose service during a computation period is not less than 1,000 hours of service but is less than service required for a full year of participation in the plan, the plan may credit the employee with a greater portion of a full year of participation than a ratable portion, or may credit an employee with a full year of participation even though the employee's service is less than the service required for a full year of participation, provided that such crediting is reasonable and is consistent for all employees within the same job classifications, reasonably established."). *See also*

13

hours of service to be credited to employees on the basis of days of employment, employees must be credited ten hours of service for each day worked.[37]

The key to determining whether a designated range meets the ratable portion requirement is the definition of a full year of service. ERISA defines a "year of participation" as a "period of service . . . determined under regulations prescribed by the Secretary which provide for the calculation of such period on any reasonable and consistent basis."[38]

### C.    Standard of Review

When a denial of benefits is challenged under section 1132(a)(1)(B), a court must review the denial de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[39] If the plan reserves discretionary authority, a court reviews the decision under "the more deferential arbitrary and

---

*Campanella*, 299 F. Supp. 2d at 283 (noting that in the example of acceptable plan ranges described in 29 C.F.R. § 2530.204-2(c)(4)(ii) the plan gives a full year of credit to an employee who works at least 1801 hours where a full year of participation under the example plan is 2000 hours).

[37]    *See* 29 C.F.R. § 2530.200b-3(e)(i).

[38]    29 U.S.C. § 1054(b)(4)(A).

[39]    *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1987).

14

capricious standard."[40]  "The plan administrator bears the burden of proving that the deferential standard of review applies."[41]  The Local 52 Plan has reserved and exercised discretionary authority to determine eligibility for benefits and to construe the terms of the plan.   Therefore, this Court must determine whether the interpretation of the plan was "without reason, unsupported by substantial evidence or erroneous as a matter of law."[42]

## IV.   DISCUSSION

Plaintiffs contend that the Local 52 Plan violates ERISA because the ranges listed in Section 4.01(a) fail to provide a ratable portion of a full year of credit for partial years of service.  Specifically, they argue that a full year of participation should be defined, as a matter of law, as 1,500 hours, and that therefore the Plan ranges provide for less that a ratable portion for certain participants who worked less than a full year.  Very few courts have addressed this issue.

### A.   DOL Advisory Opinion

The parties dispute the authoritative weight of an advisory opinion

---

[40]   *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).

[41]   *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).

[42]   *Id.*

15

issued by the Department of Labor ("DOL") in 1978.[43]  Plaintiffs argue that the

Opinion has controlling weight, while Defendants contend that it has no bearing

on the outcome in this case.  The Opinion at issue addressed questions raised

about a pension plan that awarded a full year of credit for employees that served

1,800 or more hours per year.  For employees that worked less than 1,800 hours,

one month's credit was granted for each 150 hours of contributions.  The Opinion

noted that:

> the chart uses brackets based upon intervals of 150 hours.
> Since the highest bracket begins at 1800 hours, the top of
> that bracket would be 1950 hours, and 1950 hours should
> thus be used as the basis in determining whether the credit
> given for a partial year of participation represents at least
> a ratable portion of a full year.[44]

The highest bracket in the Local 52 Plan begins at 1200 hours, and is based on

intervals of 300 hours.  Applying the method laid out in the DOL Advisory

Opinion would therefore define the top of the highest bracket – and the figure used

to determine whether the Local 52 Plan met the ratable portion requirement – as

1500 hours.

---

[43]     "An advisory opinion is an opinion of the Department [of Labor] as to
the application of one or more sections of [ERISA], regulations promulgated under
[ERISA], interpretive bulletins, or exemptions."  ERISA Procedure 76-1, § 10, 41
Fed. Reg. 36281 (Aug. 27, 1976).

[44]     Department of Labor Advisory Opinion No. 78-20A, 1978 WL 5852.

DOL advisory opinions are not binding.[45]  However, they can be relied upon for their persuasive value.[46]  While the method employed in the Opinion letter is useful, it is applied where there are no  benchmarks other than the bracketed intervals.  By contrast, there are other means here by which to determine a full year of participation – in particular, the use of the two hundred day figure to credit a partial year of service for participants with fewer than thirty hours of credited service, but who also worked elsewhere in the industry, and the inclusion of the two hundred day definition in previous versions of the Plan.  Although the provision was removed, that does not alter the reasonable conclusion of the Plan fiduciaries that, in the absence of any Plan provision to the contrary, two hundred days remained a reasonable construction of a "year of participation."  Thus, the DOL Opinion is not persuasive under the circumstances of this case.

**B.    JANOWSKI**

---

[45]    *See* ERISA Procedure 76-1, § 10 ("The opinion . . . applies only to the situation described therein. Only the parties described in the request for opinion may rely on the opinion, and they may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion.").

[46]    *See, e.g., Gualandi v. Adams*, 385 F.3d 236, 243 (2d Cir. 2004); *Montoya v. ING Life Ins. & Annuity Co.*, 653 F. Supp. 2d 344, 352 n.5 (S.D.N.Y. 2009).

17

Plaintiffs rely on *Janowski v. Local 710 IBT Pension Plan*[47] for the proposition that the definition of full-time employment can be determined as a matter of law when a plan document does not contain one. The plan at issue in that case allocated pension credits on the basis of three broad ranges: (1) employees with less than twenty weeks of service received no credit, (2) those with twenty but less than thirty-five received fifty percent credit, and (3) those with thirty-five weeks or more received a full year's credit.[48] Noting that the statute and regulations require "a more accurate pro rata credit" once the 1,000 hour threshold is reached, the court found the plan in violation of ERISA.[49] However, the court did not articulate any opinion on the determinative issue in this case – what constitutes a full year of participation. Instead, the district court adopted a reformed formula that had been proposed by the plaintiffs, a decision which the Seventh Circuit affirmed. That formula is as follows:

---

[47]   500 F. Supp. 21 (N.D. Ill. 1980), *aff'd*, 673 F.2d 931 (7th Cir. 1982), *vacated on other grounds and remanded*, 463 U.S. 1222 (1983).

[48]   *Id.* at 24.

[49]   *Id.*

18

| Weeks of Service Credited | Percentage of Full Year of Participation Credited |
|---|---|
| 20 to < 21 | 50 |
| 21 to < 24 | 60 |
| 24 to < 28 | 70 |
| 28 to < 31 | 80 |
| 31 to < 35 | 90 |
| 35 and over | 100 |

Although Plaintiffs use this modified formula as an example of the policy articulated by the DOL Advisory Opinion, there is no indication that either the court or the plaintiffs used the method described in that Opinion.  In dissent, Judge Thomas Fairchild wrote that:

> This Plan does not define full-time employment. Even if it specified 52 weeks, however, its formula for part-time service would provide less than a ratable portion for persons with more than 26 weeks but less than 35 weeks of service. One with 27 to 34 weeks of service would have to receive more than the one-half year's credit allowed by the Plan in order to get a portion "not less than ratable."

> In its present form, the Plan may be construed as defining full-time employment as 35 weeks, since it awards full credit at that point. If 35 weeks be deemed full-time employment, it would follow that, however detailed the steps in the formula, one with 22 weeks of service must receive at least 22/35ths of one year's credit, one with 25 weeks must receive at least 5/7ths, and one with 30 weeks must receive at least 6/7ths.

19

> It is clear that the Plan must be modified, but I do not agree
> that the court should specify any particular complying
> formula. I note, moreover, that there are instances where
> the formula set forth in Part IV of the majority opinion fails
> to provide not less than a ratable portion unless full-time
> employment be defined as at least 39 weeks, e.g., if 23 be
> divided by any number less than 39, the quotient exceeds
> .6.[50]

The Seventh Circuit's affirmance of the adoption of the modified plan cannot

reasonably be viewed as an endorsement of a particular method of establishing

what constitutes a full year of participation when that term is undefined.  It

establishes only that the revised plan complied with ERISA when full-time

employment was defined as "at least 39 weeks."[51]

### C.   CAMPANELLA

In *Campanella v. Mason Tenders' District Council Pension Plan*,[52] a

Southern District court decided a case similar to that presented here.  In that case,

plaintiffs argued, *inter alia*, that a pension plan violated ERISA because the

accrual ranges failed to provide a ratable share to part-time employees.  The

---

[50]   673 F.2d at 942.

[51]   *Id.*

[52]   299 F. Supp. 2d 274 (S.D.N.Y. 2004), *aff'd*, 132 Fed. Appx. 855 (2d Cir. 2005) (summary order).

dispute focused on whether a full year of participation was defined as 1,500 hours or 1,820 hours:

> If 1500 hours constitutes a full year, then . . . the Plan's ranges violate ERISA's minimum accrual requirements. But Defendants argue that a full year of participation, based on 35 hours of work per week for 52 weeks, is actually not 1500 hours but 1820 hours, and therefore the Plan's accrual ranges are not only well within ERISA's requirements but in fact generously credit a full year of service to any employee who works more than 82.4 percent of a full year."[53]

The 1,500 hour definition advocated by plaintiffs represented the lower bound of the one hundred percent credit range. The 1,820 hour definition, on the other hand, came from a definition of "full-time employment" contained in separate collective bargaining agreement documents. The court noted that "[a]bsent a definition of a 'full year,' it is entirely reasonable to calculate a full year of participation as a year of full-time employment, which Defendants argue is 1,820 hours as defined in the [collective bargaining agreements]."[54]

While there is no collective bargaining agreement to refer to in the present case, Section 4.01 of the 1979 Plan, the 1988 Plan and the 1993 Plan all provide that:

---

[53]    *Id.* at 282.

[54]    *Id.* at 283.

> If in a Plan Credit Year, a Participant completes a Year of
> Vesting Service but less than 30 days of Service in
> Covered Employment, he shall be credited with a prorated
> portion of a full Pension Credit in that ratio of his days of
> Service in Covered Employment to 200.[55]

Section 4.01 of the 2000 and 2001 Plans are substantively identical.[56]  This use of

a two hundred day benchmark for the calculation of pension credit, while not as

obvious as an outright definition of the number of hours constituting a full year of

participation, weighs in favor of the Defendants' contention that 2,000 hours – not

1,500 – constitutes a full year of service under the Plan.  Further, there is no

evidence that the Plan has ever used anything other than a 2,000 hour year in

calculating benefits.  The requirement under Section 204(b)(4)(A) of ERISA that

the year of participation be used on a "consistent basis" is therefore satisfied by a

2,000 hour year of participation, as well.

    ERISA is a comprehensive statute designed to uniformly regulate

employee benefit plans.[57]  Numerous written requirements help achieve

uniformity.  Plans are required to be "established and maintained pursuant to a

---

[55]   Joint Stips. ¶ 6.

[56]   *See id.* ¶¶ 16, 21.

[57]   *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).

written instrument,"[58] and the plan terms must be communicated to participants

through an easily understood "summary plan description," and a "summary of any

material modification" to the plan.[59]  The required writings "are given primary

effect and strictly enforced, and plan administrators must adhere to 'the bright-line

requirement to follow plan documents in distributing benefits.'"[60]  However,

Congress sought to avoid making the requirements so onerous "that administrative

costs, or litigation expenses, unduly discourage employers from offering plans in

the first place."[61]  One of the ways this is accomplished is by allowing employers

to grant "primary interpretive authority over an ERISA plan" to plan

administrators.[62]  Deferring to the plan's administrators accomplishes the

important goal of minimizing litigation and encouraging the resolution of disputes

internally.

　　　Plaintiffs rely on *Gallo v. Madera* for the proposition that deference

---

[58]　　29 U.S.C. § 1102(a)(1)

[59]　　*Id.* § 1102(a).

[60]　　*Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808 (7th Cir. 2010) (quoting *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 876 (2009)).

[61]　　*Conkright v. Frommert*, 130 S. Ct. 1640 1649 (2010).

[62]　　*Id.*

23

to a fiduciary's plan interpretation "cannot be so broad as to permit them to graft additional requirements onto unambiguous plan definitions."[63]  In that case, the Second Circuit upheld the district court's finding that a decision by plan trustees to deny pension benefits could not be sustained where the trustees read in a break-in-service provision that "contravened the plain language of the plan."[64]  Adopting the two hundred day standard involves no such contravention of plain language. Plaintiffs' desired outcome would require the insertion of a 150 day standard that does not appear in the Plan documents.  This is hardly a case of "grafting additional requirements onto unambiguous plan definitions."  The ambiguity in the Local 52 Plan is obvious, and the law requires this Court to defer to the Plan administrators in resolving that ambiguity.

Plaintiffs also cite *Young v. Verizon's Bell Atlantic Cash Balance Plan* in support of their contention that the two hundred day interpretation is unacceptable.[65]  In that case, the district court held that Verizon "abused its discretion in unilaterally disregarding" a plan provision that it alleged was a "drafting mistake," and ruled that if Verizon wished to avoid the mistake, it would

---

[63]     136 F.3d 326, 330 (2d Cir. 1998).

[64]     *Id.*

[65]     615 F.3d 808 (7th Cir. 2010).

24

have to seek a court order for equitable reformation of the plan.[66] Subsequently,
Verizon did file a counterclaim for reformation, which was permitted after a trial.[67]
The Seventh Circuit affirmed, noting that Verizon had met the "rigorous" standard
of proof required for equitable reformation.[68] The present case is easily
distinguishable because the Local 52 Plan administrators have not unilaterally
disregarded a clear, but mistaken, definition of a full year of participation.
Because the evidence shows that the two hundred day year of participation has
been consistently applied here by the Plan administrators and the Plan documents
make reference to a two hundred day benchmark for the calculation of benefits,
this Court cannot find a two hundred day year of participation an unreasonable
interpretation of the Plan.

### D.    CUSTOMARY WORK YEAR

Plaintiffs argue that a plan containing a two hundred day year of
participation is unlawful in the movie industry, because it unreasonably exceeds
the customary work year. This apparently novel claim, for which Plaintiffs cite no
supporting authority, posits that while ERISA grants employers certain flexibility

---

[66]    *Id.* at 814.

[67]    *See id.* at 815.

[68]    *Id.* at 820.

in defining full-time employment, the definition must be within the parameters set

by statute and DOL Regulations.  The relevant statute states:

> [I]n the case of any employee whose customary
> employment is less than full time, the calculation of such
> employee's service on any basis which provides less than
> a ratable portion of the accrued benefit to which he would
> be entitled under the plan if his customary employment
> were full time shall not be treated as made on a reasonable
> and consistent basis.[69]

But there is no indication of how a "full time" year should be calculated.  The

legislative history of ERISA helps illuminate the motivation behind this provision

– i.e., seasonal industries:

> In general, under the conference substitute, the rules with
> respect to 'year of service', seasonal and part-time
> employees, etc., are the same for purposes of the vesting
> schedule as they are for purposes of participation (i.e.,
> generally 1,000 hours of service except for seasonal
> industries, where the customary work year is less than
> 1,000 hours).  However, the relevant year for purposes of
> applying the vesting schedule may be any 12-month period
> provided under the plan (plan year, calendar year, etc.)
> regardless of the anniversary date of the participant's
> employment (even though the anniversary date is the
> measuring point for purposes of the participation
> requirements for an employee's first year).
>
> For purposes of benefit accrual, in general, the plan may
> use any definition of the term 'year of service' which the
> plan applies on a reasonable and consistent basis (subject

---

[69]     29 U.S.C. § 1054(b)(4)(B).

to Department of Labor regulations). (Of course, the 'year' for benefit accrual purposes cannot exceed the customary work year for the industry involved.)  However, the plan must accrue benefits for less than full time service on at least a pro rata basis.  For example, if a plan requires 2,000 hours of service for a full benefit accrual (50 weeks of 40 hours each) then the plan would have to accrue at least 75 percent of a full benefit for a participant with 1,500 hours of service.  Generally, a plan would not be required to accrue any benefit for years in which the participant had less than 1,000 hours of service.  In the case of industries or occupations where the customary year is less than 1,000 hours (for example, the tuna fishing industry, or the winter season employees of a ski lodge), the rules with respect to benefit accrual would be determined under Department of Labor regulations.  As previously indicated a special rule is provided for the maritime industries.[70]

Plaintiffs present no admissible evidence indicating that there is a reason to treat the Local 52 technicians as seasonal employees.  There may be periods during which employment is more or less available, but nothing inhibits a Local 52 member from working throughout the year.  Though the filming of movies may vary by season, it cannot be reasonably called a seasonal industry.

Additionally, the evidence presented by the parties indicates that many of the Local 52 Plan participants worked more than two hundred days in any

---

[70]    H.R. Rep. No. 93-1280, (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5050.

27

given year.[71]  Kammerer worked over two hundred days in 1997, and Halligan

worked more than two hundred days in five different years (1982, 1983, 1985,

1987 and 1988).[72]  The "customary work year" is a slippery concept in an industry

of freelancers.  This Court will not intervene when the evidence shows that a

significant number of Plan participants were able to meet the two hundred day

threshold.  Plaintiffs' motion for summary judgment on this ground is therefore

denied.[73]

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion is granted, and

Plaintiffs' motion is denied.  The Clerk of the Court is directed to close these

motions (Docket Nos. 20 and 24) and this case.

---

[71]    *See* Two Hundred Day Chart, Ex. 3 to Ubillus Aff.

[72]    *See* Pension Histories, Exs. 33, 49 to Joint Stips.

[73]    Because Defendants' motion for summary judgment is granted on other grounds, there is no need to address whether Kammerer's claims are time-barred.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 31, 2011

29

**-Appearances-**

**Counsel for Plaintiffs:**

Edgar Pauk, Esq.
27 Eighth Avenue
Brooklyn, NY 11217
Tel: (347) 529-4604

Robert Bach, Esq.
60 East 42nd Street
40th Floor
New York, NY 10165
Tel: (212) 867-4455

**Counsel for Defendants:**

Myron D. Rumeld, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Tel: (212) 969-3021

30